UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| FULVIO ZERLA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:19-cv-01140-JES-JEH |
| STARK COUNTY, ILLINOIS, and STEVE SLOAN, in his individual capacity and official capacity, | ) ) ) ) ) |
| Defendants. | ) |

## ORDER AND OPINION

This matter is now before the Court on Plaintiff Fulvio Zerla's Motion (Doc. 58) for Partial Summary Judgment, as to Liability Only. Defendants Stark County, Illinois, and Steve Sloan have filed a Response (Doc. 59) and Plaintiff has filed a Reply (Doc. 61). For the reasons set forth below, Plaintiff's Motion (Doc. 58) is DENIED.

### LEGAL STANDARD

Summary judgment is appropriate where the movant shows, through "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials" that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. To overcome the undisputed facts set forth, the non-movant must point to affidavits, depositions, or other evidence of an admissible sort that show a genuine dispute of material fact exists between parties. *Id.*; *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996). When presented with the motion for summary judgment, the Court must construe the record "in the light most favorable to the nonmovant." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). It

1

cannot "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id*. "The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

## DISCUSSION

The facts of this case and summary judgment briefing are lengthy but the question of liability is discrete – whether Defendant Steven Sloan retaliated against Plaintiff Fulvio Zerla for exercising his First Amendment rights. Zerla likens the events that unfolded in Stark County, Illinois in June 2017 to a military coup in a developing country or the storming of the U.S. Capitol. Doc. 58, at 36. Meanwhile, Defendants describe the situation as citizens exercising their free speech rights to make their voices heard to the individuals who were in public office, as they were entitled to do. Doc. 59, at 22. For background relevant to this Opinion,[1] in December 2016, Coleen Magnussen, the Chairperson for the Stark County Board, appointed Sloan as the Sheriff of Stark County and County Coroner. At the time, the Board also included Zerla as the Vice-Chairperson, four other members, and the State's Attorney for Stark County as legal counsel.

At some point, potentially even before Sloan was appointed, the Board became critical of the Sheriff's Office being overbudget. Therefore, the Sheriff's Office became part of the Board's meeting agenda every month and Sloan had to attend the meetings to give reports on his office and request more money when necessary. Sloan disagreed with the Board's interpretations of why he was over budget and how he should fix it. After having previous private meetings in

---

[1] The Court recognizes the Parties provided an abundance of purported facts in their briefing. In the interest of efficiency, the Court only discusses the facts that were most relevant to its decision summary judgment decision.

April 2017 to discuss the budget, Sloan attended a small, public board meeting on May 9, 2017. At the meeting, board members and Sloan disagreed with one another, but the meeting was successfully concluded. Following the meeting, the local news reported about tension between Magnussen and Sloan, which generated conversation on social media. On Facebook, Sloan thanked people for supporting him and encouraged people to attend the next meeting set for June 13, 2017, which was open to the public. The Board attempted to hold that meeting, but it was continued, at least in part, so that it could be held at a larger venue. The Board attempted to hold the rescheduled meeting on June 15, 2017, where 200 individuals attended, but it was ended before the Board could conclude all of its business. Through this lawsuit, Zerla alleges Sloan abused his power as Sheriff to retaliate against Zerla for exercising his First Amendment right of free speech as a legislator of the Board who publicly criticized the Sheriff's budget.

The Parties agree three elements must be met: (1) that Zerla engaged in speech that is protected by the First Amendment; (2) Zerla suffered a deprivation that deterred his protected speech; and (3) Zerla's protected speech was a motivating factor for Sloan's retaliation. Doc. 59, at 21. *See Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008); *Hagan v. Quinn*, 867 F. 3d 816, 822 (7th Cir. 2017). Plaintiff's failure to demonstrate one of these elements means his motion for summary judgment must be denied. Therefore, the Court focuses on element two – that Zerla suffered a deprivation that deterred his protected speech, which clearly has issues of material fact that must be resolved by a jury. For the reasons discussed below, summary judgment is denied.

In section 1983 actions, "[a]ny deprivation under color of law that is likely to deter the exercise of free speech" can be actionable if "the circumstances are such as to make such a refusal an effective deterrent to the exercise of a fragile liberty." *Power v. Summers*, 226 F.3d

815, 820-21 (7th Cir. 2000) (citing *Bart v. Telford*, 677 F.2d 622, 624-25 (7th Cir. 1982)). The test is whether a person of "ordinary firmness" would be deterred from exercising his or her First Amendment rights. *Bart*, 677 F.2d at 625. Even a "campaign of petty harassment" including reprimands and ridicule, or other "minor forms of retaliation" and "false accusations" may be actionable under the First Amendment if it is enough to deter the exercise of free speech." *Massey v. Johnson*, 457 F.3d 711, 720–21 (7th Cir. 2006) (quoting *Bart*, 677 F.2d at 625; *DeGuiseppe v. Vill. of Bellwood*, 68 F.3d 187, 192 (7th Cir.1995)). Zerla claims the undisputed evidence proves Sloan abused his position as Sheriff by failing to maintain order at board meetings and engaging in a "campaign of actual intimidation," which deterred Zerla's speech. Defendants argue there are genuine issues of fact regarding whether Zerla suffered a deprivation that chilled his speech. At this stage, the Court cannot make a finding as matter of law that a person of ordinary fitness would have been deterred from exercising his First Amendment rights.

      On the issue of suffering a deprivation, Zerla focuses on events surrounding board meetings. The Court considers these actions and inactions as a whole campaign of harassment but discusses them in turn. Zerla first discusses Sloan "cussing" at him during the May 9, 2017, meeting as a threatening behavior. Sloan, without raising his voice, had pointed at Zerla and said, "You can roll your eyes all you want, Fulvio. I don't give a shit. But, you know, look at me and talk to me. Don't roll your eyes." Pl. SOF¶ 55; Defs. SOF¶ 27. A reasonable jury could find using the word "shit" intimidating, or it may not. The Court does not particularly find it so, as Sloan merely complained that, while Zerla disagreed with Sloan's explanation of the budget over-runs, he did so non-verbally and ineffectively.[2] Additionally, this discussion was specific to

---

[2] Zerla disputes whether he was shaking his head and rolling his eyes at Sloan during this meeting. Doc. 61, at 7.

4

the Sheriff's Office, so it was not unreasonable for Sloan to opine on issues relevant to his office. Whether his conduct crossed the line into intimidation is matter for the jury to decide.

In connection with the above statement and other instances, Zerla reiterates Sloan was intimidating because he, the on-duty Sheriff, had a firearm with him. It is unclear whether Zerla insinuates that he feared the Sheriff would shoot him or the Sheriff should not be armed while on duty at meetings. *See e.g.,* Doc. 58, at 31 (claiming "[Zerla] was fearful for his life, since the Sheriff – the person charged with protecting the community – was leading this campaign against him."); Doc. 61, at 27 (admitting "Sloan did not do anything overtly or covertly with his service weapon that led Zerla to believe Sloan was trying to threaten him."). The record does not show Sloan threatened Zerla. Rather, Zerla maintains Sloan's mere status as Sheriff, with power to control and have a gun, made him automatically intimidating and chilled Zerla's speech.

Zerla then cites Facebook posts that Sloan made, in particular, those between the May 9 and June 13 meetings, which he claims were attempts to "intimidate the Board." Notably, he does not claim the posts were specific to Zerla. The Court mentions this distinction because, although Sloan was allegedly intimidating "the Board," Zerla is the only Plaintiff in this case, not Magnussen, or other board members who attended the later June 15 meeting that Zerla was afraid to attend. Generally, the Facebook statements were generic calls for attendance at the next meeting, signed by "the Sheriff." Some of Sloan's statements were unprofessional but the question is whether they rose to the level of threat, coercion, intimidation, or profound humiliation. None of the Facebook posts mentioned Zerla by name. Indeed, the Court noticed a reference to "her" but presumes this pronoun may have referred to Magnussen, the Chairperson.

As to the effect of the "chatter" generated by the posts, there is a distinction between

statements Sloan made and how people reacted, and whether his intent was to suppress Zerla's speech. It is a better-suited for a jury to make such determination. Moreover, the Court has yet to see how the events described in this lawsuit have any semblance to "the storming of the Capitol," which included fatalities, hundreds of reported injuries, millions of dollars in estimated property damage, and countless criminal charges, let alone a "military coup in a developing country." Zerla cites nothing to suggest commentators planned any violence. Indeed, Zerla states t-shirts were sold, and prayer was held outside, prior to the public meeting where the attendees were entitled to be, as opposed to unlawfully roaming the halls of a restricted government building.

Defendants also cite evidence to demonstrate Zerla did not suffer a deprivation in spite of the social media activity. Following the activity, Zerla co-authored a "Budget Compliance Letter" on behalf of Magnussen that detailed budget information to inform Sloan that his office was overbudget for payroll expenses. Pl. SOF¶ 90; Defs. SOF¶¶ 64-70. The letter also informed Sloan that his office risked running out of funds and no additional funding was anticipated. On June 7, 2017, the letter was sent to Sloan, other board members, and three media outlets. Yet, following the letter, Magnussen removed Sloan from the next meeting agenda on his budget.

As to the June 13, 2017 meeting, Zerla claims he was not able to give the speech he prepared because Sloan stirred the crowd and failed to maintain order despite it being his job to do so. Doc. 58, at 30. He also states the board was unable to conduct business and the meeting was rescheduled because of the chaos. *Id*.

There is dispute of fact as to whether the June 13 meeting was cancelled due to the number of people who tried to attend and the Board's inability to comply with the Illinois Open Meetings Act requiring "anyone who desires to attend . . . be given that opportunity". *See* Pl.

SOF¶ 129; Defs. SOF¶¶ 94-96. Zerla admits the Board was aware of the large attendance anticipated at the meeting, but chose not to move the location. The Board also chose not to reinstate Sloan on the agenda. The reason for the large attendance on June 13 is also disputed. Zerla blames Sloan's retaliatory incitement on Facebook, but Defendants dispute such characterization. Defendants also cite the Board's decision to remove Sloan from the agenda, effectively silencing him on the budget in his office. This, along with, Zerla's and Magnussen's private meetings outside the board, and their unilateral decision-making angered some individuals when it became known to the public. The Parties also dispute the actions Sloan took to protect the Board and whether the police presence was sufficient.

      As to the rescheduled meeting on June 15, 2017, Zerla admits he did not plan to attend because he had a meeting in Kewanee, Illinois, that night and he informed others of this inability to attend. However, the board meeting was still in session after his meeting ended; but after viewing or listening to portions of a Facebook live video *while he was driving*, he claims to have feared for his safety, so he did not attend the meeting. Thus, he was unable to make his speech.

      Zerla's evidence to show he was deterred from the June 15 meeting is weak, but a jury may disagree. It is undisputed that other board members, including Magnussen, attended that meeting*,* which negates Zerla's insinuation that it was reasonable for him to fear for his safety, and, thus, to have been effectively prevented from attending prior to hearing bits of the Facebook video. Moreover, Zerla admission's that he did not plan to attend the meeting due to a prior commitment deflates his deterrence argument.

      As to the occurrences prior to the public comments section, Zerla was not present, and he does not claim that he was aware of them. Rather, he admits the criticisms he heard or saw on

7

Facebook live, which made him fearful, were directed at two other board members, not him. To the extent it is even relevant to considering whether Zerla was deterred, the Parties also dispute what actions, if any, Sloan and uniformed officers took to control the crowd at the meeting and why the meeting was ended prematurely. Notably, while Zerla previously complained about the lack of uniformed officers, he now complains about the presence of a number of uniformed officers. The record is unclear as to whether the officers' actions in escorting the board members on June 15 were done to protect them or force them to leave. Regardless, Zerla was not present during this instance and did not witness it on Facebook live.

Zerla then asserts he resigned from his position on the Board because of Sloan's actions at the May and June meetings, Zerla feared for his safety, and he wanted the Board to be able to conduct meetings again. Doc. 58, at 31. Additionally, Magnussen, who was also allegedly targeted by Sloan, similarly resigned, therefore demonstrating a person of "ordinary fitness" would have been deterred. The Court agrees the above could constitute strong support for his position, however, it is not conclusive to the extent the Court could enter summary judgment in Plaintiff's favor. For example, Defendants likewise identify testimony from another board member, Al Curry, who did not feel threatened at the June 13 meeting Zerla attended. Defs. SOF¶¶ 98-99. There is also a distinction between Zerla's and Magnussen's experience in that Magnussen was actually present at the June 15 meeting and many of Sloan's actions were more directed or impactful upon Magnussen and her family. *See e.g*, Pl. SOF¶¶ 69, 74-86, 188-190.

Finally, Zerla agrees with Defendants that Sloan had a constitutional right to freedom of speech but claims Sloan, at some point, went beyond the limit of that right. Doc. 61, at 31. In cases where "the alleged retaliatory action is in itself speech," the speech is only actionable

8

where there is 'threat, coercion, or intimidation that punishment, sanction, or adverse regulatory action w[ill] immediately follow.' *Hutchins v. Clarke*, 661 F.3d 947, 956-57 (7th Cir. 2011) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000)). Even with the above, Plaintiff has not identified what the threat was to Zerla. At best, he states personal safety but does not provide specific facts supporting why he feared for his life other than Sloan's mere status as an armed officer. He also does not identify instances, for example, where members of the public incited by Sloan were destroying property or assaulting individuals physically or verbally. He does not identify any statements that were made which threated his life and admits none were made at the June 13 meeting. Doc. 61, at 26. Attendees did "call for" his and Magnussen's resignations, but it does not appear any "punishment, sanction, or adverse regulatory action" was threatened. He discusses the great number of individuals at the June 15 meeting, but he was not in attendance and does not claim he knew 200 individuals were. At trial, Plaintiff will be free to further articulate the threat, but he has not done so here. In sum, there are disputed issues of fact and actions that are subject to two reasonable interpretations on whether Sloan deterred Zerla's protected speech and at what point, he did so.

## CONCLUSION

For the reasons set forth above, Defendant's Motion (Doc. 60) for Leave to File Instanter is GRANTED and Plaintiff's Motion (Doc. 58) for Partial Summary Judgment is DENIED.

Signed on this 11th day of April, 2022.

s/James E. Shadid
James E. Shadid
United States District Judge
